UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF WISCONSIN

---

IDC FINANCIAL PUBLISHING, INC.,

        Plaintiff,

    v.

BONDDESK GROUP, LLC, TRADEWEB
MARKETS LLC D/B/A TRADEWEB
DIRECT, FIDELITY BROKERAGE
SERVICES, LLC, NATIONAL FINANCIAL
SERVICES, LLC,

        Defendants.

Case No. 2:15-cv-01085-PP

---

## SECOND AMENDED COMPLAINT

---

Plaintiff IDC Financial Publishing, Inc. ("IDC"), by and through its attorneys, Godfrey &

Kahn, S.C., alleges the following second amended complaint against the Defendants BondDesk

Group, LLC and TradeWeb Markets LLC d/b/a TradeWeb Direct (collectively, "BondDesk"),

and Fidelity Brokerage Services, LLC, and National Financial Services, LLC (collectively,

"Fidelity Investments"). This second amended complaint is filed pursuant to the Court's May 14,

2018 Order (Dkt. No. 55), which approved the prior stipulation and agreement of the parties.

Accordingly, IDC's second amended complaint is necessarily limited to reflect and account for

only those amendments consistent with the express terms of the Court's May 14 Order, and does

not reflect all the information learned through discovery.

## <u>INTRODUCTION</u>

1.      This is an action against BondDesk and Fidelity Investments for breach of

contract for the improper and willful misappropriation of IDC's copyright protected rankings and

financial analysis of banks and other financial institutions.  This action also seeks redress against

BondDesk and Fidelity Investments for their tortious interference with IDC's existing and prospective contractual relations and for misrepresentation.

2.      IDC is in the business of analyzing the financial health of banks and other financial institutions.  IDC establishes a numeric rank for any financial institution that files regulatory financial reports.  The numeric rank is an indicator of a financial institution's overall financial health, ranging from a low of 1 to a high of 300.  The IDC rank is akin to a credit score and is based on IDC's detailed proprietary analysis.  IDC compiles its financial analysis and related ranks into copyright protected hard-copy and electronic literature, which in turn it distributes to clients by means of License and Subscription Agreements.

3.      BondDesk and Fidelity Investments have willfully and improperly acquired, copied and disseminated IDC's ranking of financial institutions (the "IDC Ranks"), as well as IDC's financial analysis (the "IDC Financial Ratios"), far beyond the scope of the permitted use reflected in controlling License and Subscription Agreements, without commensurate payment to or the approval of IDC.

4.      The actions of BondDesk and Fidelity Investments have had a devastating financial impact on IDC causing it to suffer substantial damages as a result of their intentional and improper actions, and unjustly enriching them through the additional profits and remuneration they have derived from their unlawful and improper conduct.

## THE PARTIES

5.      IDC is a privately-held, Wisconsin corporation with a principal place of business in Hartland, Wisconsin.  IDC has been in business since 1984.  IDC analyzes and rates banks and other financial institutions, such as credit unions and savings institutions, and then enters into service agreements with its customers for the delivery of and convenient access to its IDC Ranks

alone or together with its Financial Ratios, pursuant to License and Subscription Agreements defining the scope of each customer's permitted use and access.

6.    BondDesk operates a fixed-income electronic trading platform that provides services to financial institutions, such as Fidelity Investments, to assist with their purchase of bonds, CDs and related financial service products.  BondDesk Group, LLC, was acquired by TradeWeb Markets, LLC and rebranded as TradeWeb Direct in 2013.   BondDesk operates through a number of different brands and tradenames, such as BondDesk, TradeWeb Direct, and TradeWeb Global.

7.    Fidelity Brokerage Services, LLC ("FBS") and National Financial Services, LLC ("NFS") do business under the registered tradename of Fidelity Investments.  Fidelity Investments is a national financial services firm that provides a wide variety of financial service products to its customers through a series of separately run and managed divisions.  These divisions include Fidelity Institutional, Fidelity Capital Markets, and Fidelity Retail.

8.    Fidelity Institutional offers clearing, custody, investment products, brokerage and trading services to a wide range of financial intermediary firms.  Nearly 10,000 financial advisory and brokerage firms rely on Fidelity Institutional's innovative technology and expertise to help more than four million investors make complex investment decisions.  Under the Fidelity Institutional umbrella are additional Fidelity divisions including Fidelity Institutional Wealth Services, which provides comprehensive custody platform brokerage services trading capabilities and practice management consulting to registered investment advisors, asset managers and retirement record-keepers.

9.    NFS serves as a comprehensive clearing platform, offering trading capabilities, business processes, and operations to broker-dealer firms, banks and insurance companies.  NFS

also has a brokerage platform that supports all of Fidelity Investments' clearing and custody businesses, including its retail and capital market businesses. NFS has more than $3.4 trillion under administration.

10.     Fidelity Capital Markets is the institutional trading arm of Fidelity Investments, operating as a division of NFS. Fidelity Capital Markets provides trading products and services to a wide array of clients including financial institutions and hedge funds, as well as Fidelity Investments' own businesses. Fidelity Capital Markets also offers a suite of electronic brokerage products and execution services across multiple asset classes including equities, fixed-income options as well as prime brokerage, securities lending and municipal and bank-issued brokered CDs.

11.     Finally, Fidelity Retail is the retail division of Fidelity Investments, operating under FBS, and provides investment-related services to hundreds of thousands of Fidelity Investments customers.

**JURISDICTION AND VENUE**

12.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1332, as there is diversity jurisdiction. As recited in detail below, the parties are of diverse citizenship and the amount in controversy is greater than $75,000, exclusive of interest and costs.

13.     IDC is a Wisconsin corporation, whose principal place of business is located in Wisconsin.

14.     BondDesk Group, LLC is a Delaware Limited Liability Company, whose principal place of business is located in California, and whose citizenship for purposes of diversity jurisdiction is determined by the citizenship of its constituent member(s). In 2013, BondDesk was acquired by TradeWeb Markets, LLC, a Delaware Limited Liability Company,

whose principal place of business is located in New York.  Upon information and belief, TradeWeb Markets, LLC, is owned by Thomson Reuters Corp., Goldman Sachs, JPMorgan, Morgan Stanley, Citigroup, Bank of America, Credit Suisse Group AG, Deutsche Bank AG, UBS AG, Royal Bank of Scotland Group Plc, and Barclays Plc.  Upon information and belief, Thomson Reuters Corp. is a foreign corporation with its principal place of business in New York;  Goldman Sachs is a New York corporation with its principal place of business in New York; JPMorgan is a National Bank with its principal place of business in New York; Morgan Stanley is a Delaware corporation with its principal place of business in New York; Citigroup is a National Bank with its principal place of business in New York; Bank of America is a National Bank with its principal place of business in North Carolina; Credit Suisse Group AG is a foreign corporation with its principal place of business outside of the United States; Deutsche Bank AG is a foreign corporation with its principal place of business outside of the United States; UBS AG is a foreign corporation with its principal place of business outside of the United States; Royal Bank of Scotland Group Plc is a foreign corporation with its principal place of business outside of the United States; and Barclays Plc is a foreign corporation with its principal place of business outside of the United States.

15.     FBS is a Delaware Limited Liability Company, whose principal place of business is in Rhode Island.  FBS is a wholly owned subsidiary of Fidelity Global Brokerage Group, Inc., a Delaware corporation with a principal place of business in Massachusetts.

16.     NFS is a Delaware Limited Liability Company, whose principal place of business is in Massachusetts.  NFS is another wholly owned subsidiary of Fidelity Global Brokerage Group, Inc.

17.     Venue is proper in this district under 28 U.S.C. § 1391(b) because, among other reasons, the Defendants are subject to personal jurisdiction here and a substantial part of the events giving rise to the claim in this action occurred in this judicial district.

18.     Defendants BondDesk and Fidelity Investments are both subject to personal jurisdiction in this district pursuant to Wis. Stat. § 801.05(1)(d) because they are engaged in substantial and not isolated activities within this state, because the unlawful conduct challenged in this second amended complaint was directed at IDC within the State of Wisconsin, and because Defendants' tortious conduct resulted in substantial damages to IDC sustained within the State of Wisconsin.

19.     The exercise of personal jurisdiction over Defendants is consistent with the Due Process Clause of the U.S. Constitution.

## FACTUAL BACKGROUND

<u>IDC's Business</u>

20.     IDC assesses capital strength, loan delinquencies, profit margins and other financial data of financial institutions to produce a bottom-line score for each financial institution that is referred to by IDC as a "CAMEL" rating.  IDC's CAMEL rating is also known in the industry as simply the IDC Rank, ranging from a low of 1 to a high of 300, and is an indicator of a financial institution's overall financial health.

21.     IDC markets and sells its services of providing IDC Ranks and Financial Ratios through License and Subscription Agreements, which include a Use of Service Statement.

22.     In simple terms, IDC customers pay a license fee based on the number and type of users to whom access to the IDC Ranks and Financial Ratios will be granted, as well as the customers' plan to disseminate the information.  One of the reasons IDC's customers acquire

6

IDC Ranks and Financial Ratios is to assess credit risks when purchasing financial products sold by various financial institutions, such as certificates of deposit (CDs).

23.     The fees charged by IDC are based on the customer's written representations in the Use of Service Statement reflecting the number and type of end-users to whom access is to be provided by that customer pursuant to the License and Subscription Agreement.  Once a customer has completed a Use of Service Statement, signed a License and Subscription Agreement, and has paid the licensing fee that has been calculated based upon the representations in the Use of Service Statement, IDC then provides its services, including the delivery of its copyright protected IDC Ranks and its Financial Ratios.  The IDC Ranks and Financial Ratios are delivered to the customers in either or both hard-copy or electronic Excel spreadsheet format.

24.     IDC Ranks and Financial Ratios are considered the "gold standard" for bank ratings, as they are relied upon throughout the financial services industry by investors desiring to assess the financial health and creditworthiness of banks and other financial institutions.  IDC Ranks have a remarkable record of accurately predicting financial institution failures over the past 20 years.

25.     The services provided by IDC for the timely, convenient, and easily accessible access to the most current IDC Ranks and Financial Ratios through hard copy and/or electronic dissemination have substantial economic value.  Improper and unauthorized access to these services by end users who have not been approved and incorporated into the pricing of the servicing agreements with IDC's customers not only confers substantial economic benefits upon those improperly distributing and accessing such services, but dilutes the value of IDC's interests and deprives IDC of substantial sources of revenue.

7

26. On or about September 4, 2008, IDC and BondDesk entered into a services agreement (the "BondDesk Agreement") through which IDC would make its IDC Ranks and Financial Ratios available for display on BondDesk's trading platform to "Authorized Customers" as defined by the BondDesk Agreement. The BondDesk Agreement had an effective date of August 25, 2008. (A copy of the BondDesk Agreement is attached as Exhibit A and incorporated by reference.)

27. An Authorized Customer under the BondDesk Agreement is a BondDesk customer that has been approved by IDC in writing for viewing the IDC Ranks and Financial Ratios per the Use of Service Statement. *Id.* at §§ 4, 5, and 16.

28. In order to become an Authorized Customer, a BondDesk customer must enter into a separate License and Subscription Agreement with IDC. *Id*. at § 16.

29. A License and Subscription Agreement requires a Use of Service Statement that sets forth the number of individuals to whom the IDC Ranks alone, or together with the IDC Financial Ratios, will be made available. The Use of Service Statement also identifies the customer's requested use and dissemination of the IDC Ranks and Financial Ratios. IDC calculates the license fees based on the number and type of individuals to whom access is to be granted. IDC reserves the right to prohibit or limit the number and type of end-users who are to be permitted access to the IDC Ranks and Financial Ratios if IDC determines that such prohibitions or restrictions are necessary to prevent the dilution of the value of the IDC Ranks and Financial Ratios.

30. Under the BondDesk Agreement, BondDesk enjoyed a three-year exclusive right to display IDC Ranks and Financial Ratios on BondDesk's trading platform, provided each

BondDesk customer signed a valid Use of Service Statement and License and Subscription Agreement with IDC.  As a result, BondDesk was able to provide its existing and prospective customers with convenient access to the IDC Ranks and Financial Ratios.  In turn, IDC benefitted as it gained access to potential new customers through BondDesk referrals.

Fidelity Capital Markets Contracts with IDC to Receive IDC Ranks for a Finite Number of its Broker-Dealers

31.     Fidelity Capital Markets, through Anne Rudser, first contracted to receive IDC Ranks and Financial Ratios in March 2003.

32.     On or about February 6, 2009, Rudser submitted to IDC an updated Use of Service Statement for renewal of the subscription on behalf of Fidelity Capital Markets. Consistent with the manner in which IDC delivers and prices its services for accessing its IDC Ranks and Financial Ratios, Rudser and Fidelity Capital Markets updated and confirmed the scope of services they were purchasing from IDC.  This particular updated Use of Service Statement stated that the IDC Ranks and Financial Ratios would be used internally at Fidelity Capital Markets at a single geographic location in Massachusetts.   (A copy of this February 6, 2009 Use of Service Statement is attached as Exhibit B and incorporated by reference.)

33.     On February 23, 2009, Rudser completed an updated Use of Service Statement for renewal of the subscription on behalf of Fidelity Capital Markets that added Credit Union Financial Profiles.  And, on February 24, 2009, Rudser then signed an Order Schedule and License and Subscription Agreement.  Given its receipt of these Use of Service Statements, the Order Schedule and the License and Subscription Agreement, on April 8, 2009, IDC signed this License and Subscription Agreement.  (A copy of the February 23, 2009 Use of Service Statement, the Order Schedule, and this License and Subscription Agreement are attached as Exhibit C and incorporated by reference.)

9

34.     On March 23, 2009, Fidelity Capital Markets, through Anne Rudser, signed a Renewal Order Schedule and a License and Subscription Agreement with IDC.  (A copy of this March 23, 2009 Renewal Order Schedule and License and Subscription Agreement is attached as Exhibit D and incorporated by reference.)

35.     On or about June 4, 2009, Rudser completed yet another updated Use of Service Statement for Fidelity Capital Markets.  Rudser and Fidelity Capital Markets again represented and confirmed that the IDC Ranks and Financial Ratios would be distributed only to Fidelity Capital Market employees at a single Massachusetts location.  Rudser and Fidelity Capital Markets further represented that Fidelity Capital Markets would distribute only the IDC Ranks in offerings of brokered CDs to no more than 250 broker-dealers. (A copy of this June 4, 2009 Use of Service Statement is attached as Exhibit E and incorporated by reference.)

36.     On or about July 13, 2009, Rudser once again completed an updated Use of Service Statement for Fidelity Capital Markets.  Rudser and Fidelity Capital Markets again represented that the IDC Ranks and Financial Ratios would be distributed only to Fidelity Capital Market employees within a single Massachusetts location, and that Fidelity Capital Markets would distribute only the IDC Ranks in offerings of brokered CDs to no more than 400 broker-dealers.  Rudser and Fidelity Capital Markets were prohibited from redistributing IDC Ranks of Financial Ratios any further than the stated and agreed-upon scope of services set forth in the Use of Service Statement.  (A copy of this July 13, 2009 Use of Service Statement is attached as Exhibit F and incorporated by reference.)

37.     Each time IDC reviewed Fidelity Capital Market's updated Use of Service Statements, IDC evaluated whether it was willing to grant access to the services provided by IDC to the extent stated in the Use of Service Statement, and assessed a higher annual service fee

based on the number and type of users and redistribution represented and memorialized in the Use of Service Statement.

38. In mid-August 2009, IDC notified BondDesk that Fidelity Capital Markets should be enabled to electronically view the IDC Ranks on BondDesk's trading platform pending Fidelity Capital Markets' payment of IDC's invoice as limited by the then-currently applicable Use of Service Statement. Upon payment of the invoice, Fidelity Capital Markets, and only Fidelity Capital Markets, was an Authorized Customer under the BondDesk Agreement.

39. On or about August 28, 2009, Fidelity Capital Markets paid the amount invoiced based on Fidelity Capital Markets Use of Service Statement from July 2009, thereby entitling it to the limited access set forth in the July 13, 2009 Use of Service Statement.

40. In June 2015, Fidelity Capital Markets, through Rudser, submitted to IDC an updated Use of Service Statement dated June 11, 2015, representing and memorializing that IDC Ranks and Financial Ratios would be used by only two to five users within Fidelity Capital Markets. (A copy of this June 11, 2015 Use of Service Statement is attached as Exhibit G and incorporated by reference.)

Fidelity Institutional Contracts with IDC to Receive IDC Ranks and Financial Ratios at a Single Office for Two Years Ending in the First Quarter 2009

41. Daniel Sullivan, a Vice President at Fidelity Institutional, entered into a services agreement with IDC for Fidelity Institutional to receive access to the IDC Ranks and Financial Ratios starting in April 2007 at a single office. Sullivan and Fidelity Institutional received the IDC Ranks and Financial Ratios directly from IDC, not through BondDesk, and cancelled this services agreement in the first quarter of 2009.

11

<u>FBS Contracts with IDC to Receive IDC Ranks Directly From IDC, Not Through BondDesk, for the Purpose of "Filtering" Those Financial Institutions Falling Below a Certain "IDC Rank."</u>

42.     FBS, through Brad Treichler, first subscribed to receive the IDC Ranks in or around July 2012 directly from IDC.  On or about July 29, 2012, Treichler completed a Use of Service Statement for a subscription of IDC's services in order to obtain IDC's CUSIP database on a trial basis for filtering.  The practice of filtering—which allows an entity to identify easily financial institutions meeting certain financial strength and creditworthiness thresholds as measured by the IDC Rank—is common in the industry.  This FBS Use of Service Statement stated that the IDC Ranks would be used to "filter" CDs in order "to adhere to a common approach on filtering CDs below a certain" IDC Rank and FBS would only filter new CDs, not secondary CDs.  (A copy of the July 29, 2012 Use of Service Statement is attached as Exhibit H and incorporated by reference.)

43.     FBS receives IDC Ranks directly from IDC, not through BondDesk, and at no time did FBS request authorization to distribute, or state to IDC that it intended to distribute, IDC Ranks outside of FBS or use the IDC Ranks for other than the requested filtering.

44.     In or around November 2014, Treichler completed an updated, proposed Use of Service Statement for FBS.  Treichler and FBS again represented and confirmed that the IDC Ranks would be distributed only to FBS employees for the purpose of filtering CDs for FBS customers.  Specifically, FBS represented that it would use the IDC Rank only to filter CDs internally and then display "FDIC certificate #'s . . . to our customer on Fidelity.com which will allow them to assess whether they're within the FDIC's coverage limits or have exceeded them." (A copy of this Use of Service Statement is attached as Exhibit I and incorporated by reference.)

45.     The November 2014 proposed Use of Service Statement was never executed by IDC.  In response to this FBS proposal, IDC issued two addendums to the renewal of FBS's

License and Subscription Agreement dated November 13, 2014, and February 12, 2015. These addendums each contained recalculated annual service fees for the use of IDC Ranks by FBS for filtering only as stated in FBS's November 2014 proposed Use of Service Statement. FBS chose not to pay IDC the invoiced amounts for the proposed updated and expanded use of IDC Ranks for filtering CDs, and as a result did not receive such access. Further, Treichler confirmed to IDC on August 21, 2015, that FBS is not using the IDC CUSIP database other than for testing and would contact IDC at a later date to work out the increased invoice from IDC for use of the FDIC data. (Copies of the Addendums dated November 13, 2014, and February 12, 2015 are attached as Exhibit J and incorporated by reference. A copy of Treichler's August 21, 2015 email is attached as Exhibit K and incorporated herein by reference.)

46.     IDC never granted, and no Fidelity Investments entity, division or affiliated person ever received authorization for use of IDC Ranks and Financial Ratios beyond the use reflected in the Use of Service Statements attached to this second amended complaint as Exhibits B, C, E, F, G and H. Further, the scope of use reflected in those agreements is the only scope of use permitted and granted by IDC and paid for by any Fidelity Investments entity or division, including but not limited to Fidelity Capital Markets, Fidelity Institutional, NFS, FBS, and Fidelity Retail. Each of these Use of Service Statements were incorporated into License and Subscription Agreements, and plainly and unambiguously restricted the permitted use. At no time did IDC grant Rudser, Sullivan, Treichler, Fidelity Capital Markets, Fidelity Institutional, NFS, FBS, Fidelity Retail or any other Fidelity-affiliated person, division or entity the right to distribute IDC Ranks and Financial Ratios to any additional persons, divisions, operating entities, or end users beyond those specified in the Use of Service Statements attached as Exhibits B, C, E, F, G and H.

Fidelity Investments Expresses Greater Interest in IDC Ranks and Financial Ratios

47.     In September 2008, Dan McGovern, a representative of NFS and FBS, first contacted IDC about obtaining IDC Ranks through the BondDesk trading platform for Fidelity Investments.

48.     IDC informed McGovern that all subscribers must complete the Use of Service Statement and sign a License and Subscription Agreement, which incorporates an approved Use of Service Statement.  Further, IDC informed McGovern that in order to view IDC Ranks and Financial Ratios on BondDesk's trading platform he would need to enter into such a service agreement authorizing certain agreed and limited access to the IDC Ranks and Financial Ratios.

49.     On or about October 22, 2008, McGovern submitted a proposed Use of Service Statement on behalf of "several Fidelity Business Units."  McGovern stated in the proposed October 22, 2008 Use of Service Statement, among other things, that the "data will potentially be displayed on several Fidelity distribution channels," including "Fidelity.com (for retail investors)," "Streetscape.com > BondTraderPro (for registered reps)," and "AdvisorChannel > BondtraderPro (for registered investment advisors)."  McGovern further stated in the proposed Use of Service Statement that Fidelity Investments had a number of data servicing centers where this data would be accessible, and that Fidelity Investments employees would access the data "via web browser front ends."  (A copy of this proposed Use of Service Statement is attached as Exhibit L and incorporated by reference.)

50.     On or about October 28, 2008, IDC directed McGovern to submit a revised Use of Service Statement because the October 22, 2008 proposed Use of Service Statement he had submitted did not provide sufficient details about the proposed usage that would permit IDC to

evaluate and price the proposed services agreement.  IDC specifically directed McGovern to identify the number of locations that were to have access to the IDC Ranks and Financial Ratios.

51.     On or about November 13, 2008, McGovern submitted a revised proposed Use of Service Statement that stated that "Numerous Locations" were to have access to the IDC Ranks and Financial Ratios.  Further, McGovern sent an email in which he stated:

> Hi,
>
> I had trouble filling in some of the fields but here is a revised version.  My signature does not represent an agreement to sign up for your services.  At this point, I need to discuss the details such as setup, cost, etc.
>
> Please let me know what the next steps are.  We have an interest in showing the bank ranking information across a number of Fidelity channels.  The viewers of this information will be from all geographic locations including domestic and foreign locations.  The audience will be both retail investors as well as registered representatives/advisors.
>
> Thank you,
> Dan

(Copies of this updated, proposed Use of Service Statement sent to IDC on November 13, 2008 and the email of Dan McGovern dated November 13, 2008 are attached as Exhibit M and incorporated by reference.)

52.     A few days later on November 18, 2008, McGovern inquired about signing a License and Subscription Agreement with IDC in order to receive IDC Ranks and Financial Ratios through BondDesk's trading platform.  McGovern acknowledged that Fidelity Investments would have to sign a License and Subscription Agreement to obtain authorization to receive IDC Ranks and Financial Ratios through BondDesk's trading platform.  However, no such agreement was ever reached with IDC.

53.     Ultimately, McGovern never entered a License and Subscription Agreement on behalf of Fidelity Investments, NFS, FBS, Fidelity Retail, or any other Fidelity entity or division.

As a result, neither Fidelity Investments, NFS, FBS, Fidelity Retail, nor any other division of Fidelity Investments other than Fidelity Capital Markets, pursuant to its own Use of Service Statement and License and Subscription Agreement, ever became an Authorized Customer under the BondDesk Agreement. At no time did McGovern explain why he had decided not to pursue authorization for the requested use contemplated in his November 13, 2008 email and proposed Use of Service Statement.

BondDesk Disseminates IDC Ranks and Financial Ratios Without Approval

54.     In the fourth quarter of 2009, IDC discovered in response to audit questions it directed to BondDesk that its IDC Ranks and Financial Ratios had been improperly, and without authorization, shared by BondDesk with the entire Fidelity Investments network of entities and divisions, well beyond the limited access and use that IDC had granted to the Fidelity Capital Markets division, that had been memorialized as recently as in the July 13, 2009 Use of Service Statement with Fidelity Capital Markets. Fidelity Capital Markets and its personnel knew or should have known, moreover, that the access BondDesk had provided was well beyond the scope of its permitted use and access. Likewise, all other Fidelity Investments entities and divisions knew or should have known that BondDesk was providing access to the IDC Ranks and Financial Ratios far beyond the scope of Fidelity Capital Markets' permitted use and access.

55.     IDC immediately instructed BondDesk that none of the Fidelity Investments entities and divisions, with the sole exception of Fidelity Capital Markets, were Authorized Customers and that none of these other divisions, entities, or personnel should have access to the IDC Ranks and Financial Ratios on BondDesk's trading platform under the BondDesk Agreement or otherwise.

56.     BondDesk told IDC that this unauthorized expansion of access was a mistake, and that this mistake had been corrected.

IDC's Sales Flatten

57.     While the financial crisis of 2008-2009 posed significant challenges to many members of the financial services industry, these chaotic and strained markets were a boon to IDC's business.  As a result of the financial crisis, the sound assessment and analysis of the creditworthiness of financial institutions and their investment offerings became even more critically important than in the past.  As a direct result of the financial crisis, and because of the unique value bestowed on customers through the delivery of the IDC Ranks and Financial Ratios, IDC's sales volume increased substantially in 2008 and 2009.

58.     IDC's sales began to flatten in 2010, at a time when its sales growth should have continued given the lessons learned during the 2008-2009 financial crisis and the heightened importance in the financial services industry for timely and accurate assessments of financial institutions.  What IDC did not know at the time was that the premature termination of its sales growth was the direct result of the Defendants' improper and unauthorized expanded distribution of access to the IDC Ranks and Financial Ratios.  Upon information and belief, IDC's sales growth halted in 2010 as a direct result of the Defendants' tortious and unlawful conduct, as an enormous segment of IDC's potential market was receiving the IDC Ranks and Financial Ratios without IDC's knowledge, and without compensation to IDC.

IDC Discovers Renewed Unauthorized and Improper Actions of BondDesk and Fidelity Investments

59.     In February 2015, First Tennessee Bank Advisors told IDC it was not renewing because it could obtain for free the same IDC Ranks and Financial Ratios through Fidelity Investments' NFS division.  NFS was not an authorized recipient of the IDC Ranks and Financial

Ratios either directly from IDC or as an Authorized Customer through the BondDesk trading platform under the BondDesk Agreement.

60. IDC immediately began an investigation of BondDesk and learned the following facts, all of which were previously unknown to IDC and concealed by the Defendants:

a. In 2009, after IDC had instructed BondDesk to disable Fidelity Investments from access to IDC Ranks and Financial Ratios, Fidelity Investments had complained to BondDesk of having its access restricted.

b. Contrary to the terms and conditions of the controlling agreements, and contrary to the representations BondDesk had made that the initial unauthorized expansion had been a mere mistake that had been corrected, BondDesk deliberately renewed Fidelity Investments' unauthorized access to the IDC Ranks and Financial Ratios across the entire spectrum of the Fidelity Investments divisions in January 2010. This conduct by BondDesk—improperly induced by Fidelity Investments— allowed Fidelity Investments to gain access to and copy the IDC Ranks and Financial Ratios without authorization or right to do so.

c. BondDesk re-enabled Fidelity Investments' improper access with full knowledge that this broad access was not authorized under the BondDesk Agreement or any other controlling agreement.

d. Fidelity Investments, for its part, knew that pursuant to the terms, conditions, and restrictions of the July 2009 Use of Service Statement, only Fidelity Capital Markets was an Authorized Customer under the BondDesk Agreement.

e. McGovern, the Fidelity Investments representative whose past interactions with IDC fully apprised him of the conditions and requirements for receiving the IDC

Ranks and Financial Ratios, is the person who induced BondDesk to provide this unauthorized access. McGovern did so knowing full well that he had deliberately chosen *not* to enter into a License and Subscription Agreement with IDC once he had been advised of the fees that IDC would be charging for this access.

61.     As a result of the Defendants' conduct, BondDesk provided Fidelity Investments and Fidelity Investments knowingly accepted the unauthorized, unfettered access to IDC Ranks and Financial Ratios from 2010 to 2015.

62.     McGovern and Fidelity Investments were aware of IDC's contract with BondDesk setting forth the terms, conditions, and limitations of authorized access to the IDC Ranks and Financial Ratios through BondDesk's platform. Indeed, McGovern had submitted two Use of Service Statements in seeking to become an IDC customer in 2008. Fidelity Investments and McGovern also were aware that Fidelity Investments was required to sign a License and Subscription Agreement with IDC in order to receive the delivery of services from IDC and to view IDC Ranks and Financial Ratios on BondDesk's trading platform.

63.     Thus, for more than five years, Fidelity Investments obtained and disseminated the IDC Ranks and related Financial Ratios throughout the Fidelity Investments network of divisions, despite knowing Fidelity Investments was not entitled to the same without compensation to IDC. The Defendants concealed this expanded, unauthorized access through BondDesk's misrepresentation to IDC that any such unauthorized usage had been mistakenly granted in the first instance, and had been corrected.

64.     During this same time period, BondDesk knowingly and improperly granted to Fidelity Investments access to the IDC Ranks and Financial Ratios in violation of BondDesk's contractual obligation to limit access to and the copying of IDC Ranks and Financial Ratios to

Authorized Customers who had been identified in writing by IDC under the BondDesk Agreement.

65. IDC's discovery of this unauthorized access and dilution of the value of its business finally explained why IDC's sales had flattened in 2010 and afterwards. BondDesk's violation of its contractual obligations and its willful violation of IDC's rights—induced by Fidelity Investments' wrongful conduct—resulted in massive misappropriation, as well as unauthorized access to and copying and distribution of IDC Ranks and Financial Ratios by thousands of unauthorized persons. BondDesk permitted distribution of the IDC Ranks and Financial Ratios throughout the Fidelity Investments broad family of entities and divisions, which in turn disseminated the IDC Ranks and Financial Ratios to thousands of unauthorized users throughout the financial services industry.

66. As a result of the conduct of BondDesk and Fidelity Investments, IDC has suffered devastating financial losses in the form of lost license fees and other profits to which it is entitled given the improper access, copying, and dissemination of the IDC Ranks and Financial Ratios.

67. BondDesk and Fidelity Investments have knowingly acquired, misappropriated, distributed, and copied for themselves IDC Ranks and Financial Ratios, without compensation to IDC.

68. BondDesk and Fidelity Investments obtained substantial economic and business benefits from their misconduct, as their customers, once provided access to the IDC Ranks and Financial Ratios, could perform enhanced due diligence and assessment of financial institutions and their investment offerings. BondDesk and Fidelity Investments thus were able to offer

enhanced value and benefits to their customers, attracting and retaining more customers, and reaping substantial revenues as a result of their tortious and improper conduct.

69.     Following its investigation revealing BondDesk's and Fidelity Investments' willful misappropriation and unauthorized copying and distribution of access to the IDC Ranks and Financial Ratios, IDC demanded that Fidelity Investments access be limited in accordance with the Fidelity Capital Markets' Use of Service Statement made a part of its License and Subscription Agreement.  Despite assurances that access would be properly limited, BondDesk and Fidelity Investments initially continued to provide IDC Ranks and Financial Ratios to Fidelity Retail.  After IDC pressed its demands, BondDesk and Fidelity Investments are believed to have finally ended their willful misappropriation and unauthorized copying and distribution of IDC Ranks and Financial Ratios on or about May 6, 2015.

<u>**COUNT I**</u>
**(Breach of Contract by BondDesk)**

70.     Under the terms of the BondDesk Agreement, BondDesk was permitted and authorized to grant access to the IDC Ranks and Financial Ratios only to those "Authorized Customers" that IDC had identified in writing.  Authorized Customers are only those BondDesk customers who signed a valid Use of Service Statement and License and Subscription Agreements with IDC and paid the applicable annual fee for IDC's services.  *See* Exhibit A at §§ 4, 5, and 16.

71.     Further, BondDesk specifically contracted to refrain from providing or redistributing access to the IDC Ranks and Financial Ratios (collectively defined as "Services" under the BondDesk Agreement), except in accordance with the terms and conditions of its contract with IDC.  *Id*. at §§ 4, 5, and 10.

21

72. Further, BondDesk agreed with IDC that it would indemnify and hold harmless IDC from and against any damages resulting from or arising out of, in whole or in part, a breach by BondDesk of the BondDesk Agreement. *Id*. at § 11. BondDesk's conduct entitles IDC to this contractual indemnity.

73. BondDesk knew that the designation of Fidelity Capital Markets as an Authorized Customer in August 2009 did not grant BondDesk permission to provide IDC Ranks and Financial Ratios under the BondDesk Agreement to the entire Fidelity Investments family of entities and divisions.

74. BondDesk's conduct described in the preceding paragraphs of this second amended complaint, including its granting the entire Fidelity Investments family of entities and divisions access to the IDC Ranks and Financial Ratios, materially breached the BondDesk Agreement with IDC.

75. IDC has suffered substantial damages as the result of BondDesk's material breaches of contract, for which BondDesk is liable, in an amount to be determined at trial.

76. In addition to these damages, under the terms of the BondDesk Agreement, BondDesk is also liable for IDC's actual reasonable attorney's fees and out-of-pocket expenses. Further, pursuant to the third-party litigation exception to the American Rule of attorneys' fees, IDC has a right to recover from BondDesk all attorneys' fees and costs it has incurred in pressing its rights against the other Defendants, because such fees and costs are being incurred as a direct result and consequence of BondDesk's breach of contract. IDC is entitled to an award of these fees and costs in an amount to be determined by the Court upon the resolution of the underlying claims in this action on the merits.

## COUNT II
### (Breach of Contract by Fidelity Investments)

77.     Under the terms of Fidelity Investments' License and Subscription Agreements with IDC, and its July 2009 Use of Service Statement with IDC, only the Fidelity Capital Markets division was entitled to receive access to the IDC Ranks and Financial Ratios for its use only, as well as to disseminate IDC Ranks in offerings of brokered CDs to no more than 400 broker-dealers.

78.     Fidelity Investments materially breached its contractual obligations by improperly seeking and obtaining from BondDesk access to the IDC Ranks and Financial Ratios for dissemination throughout the entire family of Fidelity Investments entities and divisions.  Such conduct is a material breach of the Fidelity Capital Markets' Use of Service Statement that is attached to and made a part of its License and Subscription Agreement with IDC.  *See* Exhibits C, E.

79.     IDC has suffered substantial damages as the result of Fidelity Investments' material breaches of contract, for which Fidelity Investments is liable, in an amount to be determined at trial.

80.     In addition to these damages, under the terms of its contract with IDC, Fidelity Investments is also liable to IDC for IDC's actual reasonable attorney's fees and out-of-pocket expenses.  Further, pursuant to the third-party litigation exception to the American Rule of attorneys' fees, IDC has a right to recover from Fidelity Investments all attorneys' fees and costs it has incurred in pressing its rights against the other Defendants, because such fees and costs are being incurred as a direct result and consequence of Fidelity Investments' breach of contract. IDC is entitled to an award of these fees and costs in an amount to be determined by the Court upon the resolution of the underlying claims in this action on the merits.

23

## COUNT III
**(Tortious Interference with Contract by Fidelity Investments)**

81.     Fidelity Investments had knowledge of the BondDesk Agreement between IDC and BondDesk.

82.     Fidelity Investments' tortious interference includes, without limitation, Fidelity Investments' improper inducement, through the improper actions of McGovern and other persons whose identity remains to be determined through discovery, of the unauthorized use, copying, and dissemination of the IDC Ranks and Financial Ratios by BondDesk via its trading platform across the divisions of Fidelity Investments in material breach and violation of BondDesk's legal and contractual obligations to IDC.

83.     Fidelity Investments' improper interference was intentional.  Fidelity Investments knew it was required to sign a valid Use of Service Statement and License and Subscription Agreement with IDC to have the right to the delivery of services from IDC in the form of access to the IDC Ranks and Financial Ratios via BondDesk's trading platform.

84.     Fidelity Investments' interference with the BondDesk Agreement is intentional, wrongful, improper and not privileged, and Fidelity Investments' conduct was a substantial factor in causing and inducing BondDesk's material breach of its contractual obligations to IDC.

85.     Fidelity Investments' improper interference caused substantial harm and damages to IDC, in an amount to be determined at trial.  Further, Fidelity Investments has been unjustly enriched by its tortious conduct, reaping economic and business benefits to which it was not entitled.  Accordingly, separate and independent from its right to compensatory damages, IDC is entitled to an order for disgorgement from Fidelity Investments of all such ill-gotten gains, in an amount to be determined at trial.

86.     Fidelity Investments' conduct was malicious, or was pursued with an intentional disregard for IDC's rights, such that punitive damages should be awarded against Fidelity Investments in an amount to be determined at trial.

87.     Pursuant to the third-party litigation exception to the American Rule of attorneys' fees, IDC has a right to recover against Fidelity Investments all attorneys' fees and costs it has incurred in pressing its rights against the other Defendants, because such fees and costs are being incurred as a direct result and consequence of Fidelity Investments' tortious conduct.  IDC is entitled to an award of these fees and costs in an amount to be determined by the Court upon the resolution of the underlying claims in this action on the merits.

## COUNT IV
**(Tortious Interference with Prospective Contractual Relations by Fidelity Investments)**

88.     In addition to tortiously interfering with IDC's contract with BondDesk, Fidelity Investments tortiously interfered with IDC's prospective contractual relations with potential customers.

89.     IDC had a reasonable expectation of entering into or continuing prospective contractual relationships with customers looking to purchase or renew services from IDC, including obtaining access to IDC Ranks and Financial Ratios.

90.     Fidelity Investments, by improperly inducing BondDesk to provide IDC Ranks and Financial Ratios for free to Fidelity Investments and further disseminating IDC Ranks and Financial Ratios to Fidelity Investments customers through its divisions, has purposely, improperly, and without privilege interfered with IDC's prospective contractual relationships with those customers.

91.     Fidelity Investments' improper and intentional actions include, without limitation, Fidelity Investments' inducement, through the actions of Mr. McGovern, of the unauthorized

use, copying, and dissemination of IDC Ranks and Financial Ratios by BondDesk via its trading platform across the many divisions of Fidelity Investments.

92.     Fidelity Investments' tortious interference also includes, without limitation, Fidelity Investments' copying and dissemination of IDC Ranks and Financial Ratios through NFS's brokerage platform.

93.     As a result, Fidelity Investments has induced, or attempted to induce, potential customers to not enter into or not renew contracts with IDC as a result of its improper actions.

94.     Fidelity Investments' actions in interfering with IDC's prospective contractual relationships are intentional, wrongful, and not privileged.

95.     IDC's legitimate and reasonable expectancy of prospective contractual relationships with potential customers has not and will not ripen into contractual relationships because of Fidelity Investments' intentional interference.

96.     Fidelity Investments' tortious interference with IDC's prospective contractual relations has caused substantial damages to IDC, in an amount to be determined at trial.  Further, Fidelity Investments has been unjustly enriched by its tortious conduct, reaping economic and business benefits to which it was not entitled.  Accordingly, separate and independent from its right to compensatory damages, IDC is entitled to an order for disgorgement from Fidelity Investments of all such ill-gotten gains, in an amount to be determined at trial.

97.     Pursuant to the third-party litigation exception to the American Rule of attorneys' fees, IDC has a right to recover from Fidelity Investments all attorneys' fees and costs it has incurred in pressing its rights against the other Defendants, because such fees and costs are being incurred as a direct result and consequence of Fidelity Investments' tortious conduct.  IDC is

entitled to an award of these fees and costs in an amount to be determined by the Court upon the resolution of the underlying claims in this action on the merits.

98.     Fidelity Investments' conduct was malicious, or was pursued with an intentional disregard for IDC's rights, such that punitive damages should be awarded against Fidelity Investments in an amount to be determined at trial.

### COUNT V
**(Intentional Misrepresentation and Strict Responsibility by BondDesk and Fidelity Investments)**

99.      Defendants BondDesk and Fidelity Investments intentionally misrepresented to IDC, both through affirmative representations and omissions under circumstances where a duty of disclosure clearly existed, the extent to which the IDC Ranks and Financial Ratios were being disseminated by BondDesk within the Fidelity Investments divisions.

100.     The dates and substance of these misrepresentations and the individuals making such misrepresentations are reflected in Exhibits A-M to this second amended complaint, and the circumstances of these misrepresentations are recited in detail at ¶¶ 20-69 of this second amended complaint.  Each of these misrepresentations was communicated to IDC through its personnel located in the State of Wisconsin.

101.     Defendants' actions were done with intent to deceive IDC in order to obtain the delivery of services from IDC in the form of access to the IDC Ranks and Financial Ratios without having to pay for the same.  IDC reasonably and justifiably relied upon these misrepresentations and omissions, causing IDC substantial damages, in an amount to be determined at trial. Further, BondDesk and Fidelity Investments have been unjustly enriched by their tortious conduct, reaping economic and business benefits to which they were not entitled. Accordingly, separate and independent from its right to compensatory damages, IDC is entitled

27

to an order for disgorgement from BondDesk and Fidelity Investments of all such ill-gotten gains, in an amount to be determined at trial.

102.    IDC would not have allowed its IDC Ranks and Financial Ratios to be disseminated throughout the various Fidelity Investments divisions absent the false affirmative representations and omissions.

103.    Defendants' conduct was malicious, or was pursued with an intentional disregard for IDC's rights, such that punitive damages should be awarded against BondDesk and Fidelity Investments in amounts to be determined at trial.

WHEREFORE, IDC requests an order for judgment as follows:

a.    awarding IDC compensatory damages against BondDesk for breach of contract damages for Count I, including without limitation awarding actual costs and attorneys' fees pursuant to the third-party litigation exception to the American Rule, in an amount to be determined at trial;

b.    awarding IDC compensatory damages against Fidelity Investments for breach of contract damages for Count II, including without limitation awarding actual costs and attorneys' fees pursuant to the third-party litigation exception to the American Rule, in an amount to be determined at trial;

c.    awarding IDC compensatory damages against Fidelity Investments for tortious interference with existing contractual relations and for tortious interference with prospective contractual relations for Counts III and IV, including without limitation awarding actual costs and attorneys' fees pursuant to the third-party litigation exception to the American Rule, in amounts to be determined at trial;

28

d.  awarding IDC compensatory damages jointly and severally against BondDesk and Fidelity for intentional misrepresentation, and/or for strict liability misrepresentation, for Count V, in an amount to be determined at trial;

e.  ordering BondDesk and Fidelity Investments to disgorge all revenues or remuneration of any kind arising directly or indirectly out of the Defendants' tortious conduct, for Counts III, IV, and V, in amounts to be determined at trial;

f.  awarding punitive damages in favor of IDC and against BondDesk and against Fidelity Investments, in amounts to be determined at trial, for the conduct challenged in Counts III, IV, and V;

g.  awarding IDC its statutory and actual costs and attorney's fees incurred in pursuing this action; and

h.  awarding such other or further relief as is deemed just and equitable.

## JURY DEMAND

IDC demands trial by jury on all issues triable to a jury.

Dated: May 31, 2018.

**s/ John L. Kirtley**

John L. Kirtley
State Bar No. 1011577
Paul F. Heaton
State Bar No. 1000858
Matthew M. Wuest
State Bar No. 1079834
David R. Konkel
State Bar No. 1097244
Godfrey & Kahn, S.C.
833 E. Michigan St., Suite 1800
Milwaukee, WI 53202-5615
Phone: 414-273-3500
Fax: 414-273-5198
Email: jkirtley@gklaw.com
        pheaton@gklaw.com
        mwuest@gklaw.com
        dkonkel@gklaw.com

Attorneys for Plaintiff IDC FINANCIAL
PUBLISHING, INC.

18979473.2